UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JILL RAPIER, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|    vs. | ) | 1:07-cv-0798-RLY-DML |
| | ) | |
| CAPITAL ONE AUTO FINANCE, INC., | ) | |
|     Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Jill Rapier ("Plaintiff"), is a former employee of the defendant, Capital One Auto Finance, Inc. ("COAF"). COAF terminated her employment in December 2005 for gross misconduct. Plaintiff thereafter filed the instant employment discrimination suit[1] alleging gender discrimination and retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*.

On July 21, 2008, COAF filed its Motion for Summary Judgment. Plaintiff did not respond to COAF's motion with respect to her gender discrimination claims premised upon her denied requests for transfer and termination. The court finds Plaintiff waived these claims by failing to respond to COAF's motion, and therefore **GRANTS** COAF's motion with respect to these claims. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387,

---

[1] Plaintiff's Amended Complaint states that her claims are also brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. Neither party mentions any claims under the ADEA in their summary judgment submissions or Case Management Plan. The court therefore infers that Plaintiff does not wish to pursue any claims under the ADEA.

1

407-08 (7th Cir. 2007) (finding discrimination claim waived where plaintiff focused only on his retaliation claim in response to defendant's motion for summary judgment, devoting only a skeletal argument to his discrimination claim).  Accordingly, this Entry addresses only Plaintiff's retaliation claim related to her termination.  For the reasons set forth below, the court **GRANTS** COAF's motion with respect to that claim.

I.     **Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).  The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by

specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322).

**II.    Background**

1. COAF is a financial services company that markets a variety of financial products and services including auto loans. (Affidavit of Amy Girman ("Girman Aff.") ¶ 4).

2. Plaintiff began her employment with COAF in April 2001 as an Area Sales Manager ("ASM") in Indiana working from her home. (*Id.* ¶ 11; Deposition of Jill Rapier ("Plaintiff Dep.") at 39, 41).

3. At the time Plaintiff began her employment with COAF, her husband, Dave Rapier ("D. Rapier"), was also employed by COAF as an ASM. (Plaintiff Dep. at 15, 37). During this time, Plaintiff's territory consisted of Northern Indiana and D. Rapier's territory consisted of Central Indiana. (*Id.* at 38).

4. In October 2001, D. Rapier applied for a position as a Regional Sales Manager ("RSM") that required relocation to North Carolina. (Girman Aff. ¶ 12; Plaintiff Dep. at 82-83; Deposition of Dave Rapier ("D. Rapier Dep.") at 46-47).

5. D. Rapier was offered the position and, despite having to move to another state away from his wife and family, he accepted the position. (D. Rapier Dep. at 82-85).

6. At the time that D. Rapier accepted the promotion to RSM, the Rapiers knew that

COAF's Nepotism Policy would not allow Plaintiff to transfer to a territory in North Carolina and report to him. (Plaintiff Dep. at 84, 86; D. Rapier Dep. at 47-48).

7. D. Rapier thereafter moved to North Carolina and Plaintiff remained in Indiana. (Plaintiff Dep. at 86, 118; D. Rapier Dep. at 52-53).

8. In his new role as RSM, D. Rapier reported to Jeff Haymore ("Haymore"), COAF's then divisional Sales Manager. (Deposition of Jeff Haymore ("Haymore Dep.") at 14-15; D. Rapier Dep. at 55). Haymore reported to Larry Rodriguez ("Rodriguez"), the then Managing Vice President of Sales. (Haymore Dep. at 15).

9. Following D. Rapier's move, Plaintiff expressed interest in ASM positions in North Carolina. Haymore consistently denied these requests. (Plaintiff Dep. at 92, 94-95, 143-44).

10. In May 2003, Plaintiff requested a transfer to South Carolina so she could be closer to her husband. (Girman Aff. ¶ 13; Plaintiff Dep. at 94-95, 97). Although ASMs are usually required to live in the territory for which they are responsible, Haymore allowed Plaintiff to work the South Carolina territory while she lived with D. Rapier and their children. (Plaintiff Dep. at 98; Haymore Dep. at 39).

11. Plaintiff's ASM position in South Carolina was not as lucrative as her position in Indiana, and required overnight travel. Therefore, in August 2004, Plaintiff requested, and was granted, a transfer back to Indiana. (Girman Aff. ¶ 14; Plaintiff Dep. at 99, 111-12).

12. Following Plaintiff's transfer to Indiana, Plaintiff's RSM was Mike England ("England"). (Plaintiff Dep. at 93; Haymore Dep. at 34; Girman Aff. ¶ 15). England reported to Steve Rosato ("Rosato"), COAF's then Divisional Sales Manager. (Girman Aff. ¶ 15; Deposition of Steve Rosato ("Rosato Dep.") at 9, 59).

13. Within a month of moving back to Indiana, an ASM position posted for Winston-Salem, North Carolina. (Plaintiff Dep. at 92; 11/17/04 email, Defendant's Ex. K). Plaintiff sent an email inquiring about the posting and was told by Haymore that due to the 12 Month in Job Policy Requirement and the Nepotism Policy, she was not eligible to post for the position. (Plaintiff Dep. at 92, 132-33; 11/17/04 email, Defendant's Ex. K). She responded that she had "no interest" in the position. (Plaintiff Dep. at 132-33; 11/17/04 email, Defendant's Ex. K).

14. In October 2005, Rodriguez conducted a high level sales retreat for the RSMs, sales support team and sales marketing team. (Deposition of Jonathan Latham ("Latham Dep.") at 11-12). The meeting was held at the Ritz Carlton in Laguna Nigel, California. (*Id*. at 11). The employees were allowed to invite their significant others to attend, and thus, D. Rapier invited Plaintiff as his guest. (*Id*. at 12; Plaintiff Dep. at 156; D. Rapier Dep. at 148).

15. The Rapiers attended a COAF-sponsored dinner at the hotel on October 5, 2005. (Latham Dep. at 11-17, 21-26; D. Rapier Dep. at 147-49).

16. After many of the attendees had finished eating in the dining room, Plaintiff

approached Haymore on the veranda off of the dining room, and asked Haymore "why he keeps saying no" to her requests to transfer to North Carolina. (Plaintiff Dep. at 161).

17. Haymore again told Plaintiff that she could not report to D. Rapier due to the Nepotism Policy and that he was not comfortable with a manager or territory swap. (Haymore Dep. at 48-50). Haymore explained it was a business decision. (Plaintiff Dep. at 161-62; D. Rapier Dep. at 154-55).

18. Plaintiff continued to confront Haymore about his decision and how it was not allowing her and D. Rapier to "be together as a family." (Plaintiff Dep. at 162). Haymore "kept repeating it was a business decision." (*Id*. at 161-62). Plaintiff was crying and upset. (*Id*. at 162).

19. Jonathan Latham ("Latham"), an RSM with COAF at the time, was also on the veranda and overheard this confrontation between Rapier and Haymore. (D. Rapier Dep. at 153-54; Latham Dep. at 26). He went over to them and asked what was going on, said they were being loud, and told Haymore to walk away. (Haymore Dep. at 62). Haymore appeared to have the situation under control so Latham left the conversation. (*Id*.; Latham Dep. at 23-26). Soon thereafter, Latham suggested to D. Rapier that he intervene in the conversation because it was becoming "more heated." (Latham Dep. at 26, 45-46; D. Rapier Dep. at 152-54).

20. D. Rapier walked past the partition and heard Plaintiff asking Haymore why he opposed the transfer. (D. Rapier Dep. at 154). Among other things, D. Rapier

heard Plaintiff tell Haymore that Haymore had made exceptions for other people and that she felt she was being discriminated against. (*Id*. at 157). Haymore then became visibly upset and asked if she wanted to sue COAF. (*Id*.). She responded no, and Haymore left. (*Id*. at 158).

21. Shortly thereafter, Haymore walked away. (Plaintiff Dep. at 163). At the time he walked away, there were approximately six people left on the veranda, including the Rapiers, Latham, and Jeppe Heidemann ("Heidemann"), a RSM. (Latham Dep. at 28; Girman Aff. ¶ 20). The Rapiers, however, thought they were alone. (Plaintiff Dep. at 164; D. Rapier Dep. at 234-35).

22. Upset with D. Rapier for not supporting her more on the issue, Plaintiff said to him, "you sucked Haymore's dick like you always do." (Plaintiff Dep. at 166; Affidavit of Jill Rapier ("Plaintiff Aff.") ¶ 15; D. Rapier Dep. at 159; Latham Dep. at 29; Rosato Dep. at 71-72). Although D. Rapier denies saying so, Latham reported him as responding to Plaintiff, "f_king whore," and Heidemann reported him as responding, "Get out of here you whore." (Latham Dep. at 29; Rosato Dep. at 72-74). Before leaving, D. Rapier approached the Lathams and said, "This is what I have to deal with." (D. Rapier Dep. at 160-61).

23. Plaintiff had been drinking that evening and had taken a narcotic related to a health issue after dinner. (Plaintiff Dep. at 174, 181-82).

24. The next day, D. Rapier asked Plaintiff to apologize to Haymore and she did. (D. Rapier Dep. at 163).

25. Rosato – Plaintiff's boss' boss – became aware of the altercation between the Rapiers the next morning at breakfast. (Rosato Dep. at 21-22, 67-68; Haymore Dep. at 66-67). It was decided that, because there were others present and because the sales meeting was wrapping up, it would be best to discuss it once they were back in the office. (*Id.*).

26. Rosato was then out of the office off and on for the next couple of weeks, traveling to Europe and Asia, and returned to town after the Thanksgiving holiday. (Rosato Dep. at 22-24, 68-70).

27. Upon his return, Rosato contacted Amy Girman ("Girman"), Senior Human Resources Specialist, seeking assistance with how to proceed with the investigation. (*Id*. at 24). He contacted Heidemann and Latham, the two individuals with first hand knowledge of the events that evening, to find out exactly what occurred. (Rosato Dep. at 24-25; Latham Dep. at 36-37; Heidemann Aff. ¶ 5). He then followed up by sending an email to both witnesses summarizing their conversations and asking them to correct any inaccuracies. Both eyewitnesses confirmed his reiteration of the incident. (Latham Dep. at 37, 43-46; Rosato Dep. at 25, 72-74; Affidavit of Jeppe Heidemann ¶ 5).

28. Rosato also contacted Plaintiff to get her recollection of the incident. (Rosato Dep. at 26-27, 74).

29. Finally, Rosato contacted Haymore to determine what occurred that evening from his perspective. (Haymore Dep. at 56-61, 106-07; Rosato Dep. at 56-57; 12/2/05

email from Rosato to Haymore and response, Defendant's Ex. Q).

30. After discussing the information revealed in the investigation with Rodriguez, Girman, and Haymore, Rosato made the decision to terminate Plaintiff for gross misconduct because of the inappropriate sexually explicit language she used. (Rosato Dep. at 27-28, 77-78). Because the Rapiers were both involved in the same altercation, D. Rapier was also terminated for gross misconduct. (Haymore Dep. at 76-78; Rosato Dep. at 28; Plaintiff Dep. at 215).

31. There is no evidence that Haymore ever informed Rosato of Plaintiff's alleged complaint of discrimination on October 5, 2005.

## III. Discussion

Plaintiff alleges she was discriminated against for engaging in protected expression – i.e., her complaint to Haymore that her requests for transfer were denied because of her gender. A Title VII plaintiff claiming retaliation may proceed under the direct or indirect method of proof. Plaintiff appears to rely solely on the indirect method. As set forth below, regardless of which method is used, Plaintiff's retaliation claim cannot survive summary judgment.

### A. Direct Method

Under the direct method, Plaintiff must establish that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action. *Humphries v. CBOE West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); *Treadwell v. Office of Ill.*

*Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006). "The direct method carries with it an inherent requirement that the plaintiff show that the decision maker had actual knowledge of the plaintiff's protected activity." *Nellum v. Ford Motor Co.*, 2008 WL 312922, at *9 (S.D. Ind. Feb. 1, 2008) (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not enough that [the decision maker] *could* or *should* have known about Luckie's complaints, she must have had actual knowledge of the complaints for her decisions to be retaliatory.") (emphasis added)).

     Plaintiff's allegation of retaliation focuses on her assertion that she engaged in protected activity by making a complaint to Haymore about gender discrimination on October 5, 2005, at the COAF-sponsored retreat. It is undisputed, however, that Haymore did not make a decision to terminate Plaintiff's employment and in fact, he testified that he did not agree with it. (Haymore Dep. at 77, 127). Rather, Rosato and Rodriguez made the decision to terminate Plaintiff's employment in consultation with Girman. (Rosato Dep. at 27-28, 77-78). There is no evidence that Haymore communicated to Rosato, Rodriguez, or Girman that Plaintiff complained to him about gender discrimination on October 5, 2005, and there is no evidence that they otherwise had knowledge of this alleged complaint. (Rosato Dep. at 80). During the investigation following the incident of October 5, 2005, Haymore simply reported to Rosato that Plaintiff said she was being treated "unfairly" because he would not allow her to live in North Carolina and work the Charlotte market due to D. Rapier's position in that market and the Nepotism Policy. (12/2/05 email from Rosato to Haymore and response, Defendant's Ex. Q). Such general

complaints do not constitute protected activity, and would not have otherwise put Rosato, Rodriguez, or Girman on notice that Plaintiff was complaining about gender discrimination. *Nellum*, 2008 WL 312922, at *9 (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663-64 (7th Cir. 2005)). For these reasons, there can be no causal connection between Rosato, Rodriguez, and Girman's decision to terminate Plaintiff and her alleged October 5, 2005, complaint.

Plaintiff may also establish causation under the direct method by presenting evidence of suspicious timing. *Nellum*, 2008 WL 312922, at *13. Suspicious timing alone, however, is insufficient to establish a causal connection. *Id*. There must be some additional evidence presented supporting an inference of a causal link. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second. Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."); *see also Squibb v. Memorial Medical Center*, 497 F.3d 775, 787 (7th Cir. 2007) (quoting *Sauzek*); *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758-59 (7th Cir. 2006) (same); *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link." (citations omitted)). Here, Plaintiff's only evidence in support of her retaliation claim is suspicious timing. Because she offers nothing more, Plaintiff fails to establish a causal link between her complaint of

11

discrimination on October 5, 2005, and her ultimate termination.[2] Accordingly, Plaintiff's retaliation claim under the direct method fails as a matter of law.

### B. Indirect Method

Under the indirect method of proof, Plaintiff must establish that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; (3) she met her employer's legitimate expectations; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). COAF contends Plaintiff cannot meet her burden of establishing elements 3 and 4.

#### 1. Legitimate Expectations

Plaintiff offers evidence that she was one of COAF's top-grossing salespersons, and that she typically exceeded planned sales targets. However, her successful job performance prior to the events of October 5, 2005, does not negate the fact that she admittedly engaged in the misconduct on October 5, 2005, for which she was terminated. (Plaintiff Dep. at 168-69, 172; Plaintiff Aff. ¶ 15). A plaintiff's admission to the misconduct at issue prevents her from establishing that she was meeting her employer's legitimate expectations. *See Tomanovich*, 457 F.3d at 666 (holding that "admission to the

---

[2] Plaintiff also claims that she complained to Rosato about gender discrimination in June of 2005. This alleged complaint was four months prior to the October 5, 2005, incident at the Ritz Carlton that led to her termination and was six months before the decision was made to terminate her employment. As such, Plaintiff cannot establish a causal connection between this alleged complaint and her subsequent termination. *See Tomanovich*, 457 F.3d at 665 (temporal connection of four months failed to establish a causal connection between a protected activity and an adverse action).

conduct at issue prevents him from establishing that he was meeting the City's legitimate expectations."). Plaintiff therefore fails to meet her burden of establishing that she was meeting COAF's legitimate expectations at the time of her termination.

### 2. Similarly Situated Individuals

Plaintiff contends that other individuals who engaged in conduct involving the use of profanity or sexual innuendo were not terminated or otherwise disciplined. However, Plaintiff must show that the COAF employees who made the decision to terminate her employment had actual knowledge of these other alleged instances of profanity and/or sexual innuendo and chose not to terminate their employment or otherwise discipline them. *See Hempstead v. Rockford Housing Auth.*, 2000 WL 516187, at *5 (N.D. Ill. Apr. 25, 2000) (because there was no evidence that the employees who made the adverse employment decision were aware of the purported comparator's conduct, court ruled the plaintiff was not similarly situated to him) (citing *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997)). There is no evidence that Rosato, Rodriguez, or Girman (the individuals involved in the decision to terminate Plaintiff's employment) had actual knowledge of the other incidents of profanity to which Plaintiff cites and that they chose not to terminate or otherwise discipline those individuals. Without this evidence, Plaintiff fails to prove that she is similarly situated to them.

Plaintiff also focuses on the differences between her situation and the situations of other COAF ASMs and RSMs who were terminated for gross misconduct. These distinctions do not prove that similarly situated individuals who did not engage in

protected activity were treated more favorably.  It simply shows that COAF terminated other ASMs and RSMs for varying degrees of inappropriate behavior and/or sexually charged profanity at a work social event.

Because Plaintiff cannot show that she performed her job to COAF's legitimate expectations and because Plaintiff cannot show that other similarly situated individuals not in the protected class were treated more favorably, Plaintiff cannot establish her prima facie case for retaliation.  Accordingly, Plaintiff's retaliation claim under the indirect method fails as a matter of law.

### IV.     Conclusion

Plaintiff did not respond to COAF's motion with respect to her gender discrimination claims, and thus, the court finds Plaintiff waived any argument with respect to those claims.  In addition, Plaintiff failed to establish a prima facie case of retaliation under either the direct or indirect method of proof.  Accordingly, Defendant's Motion for Summary Judgment (Docket # 42) is **GRANTED**.

**SO ORDERED** this __6th__ day of January 2009.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Susan G. Gainey
KIGHTLINGER & GRAY

sgainey@k-glaw.com

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@brown-tompkins-lory.com

Stephanie Lee Reaugh
HUNTON & WILLIAMS, LLP
sreaugh@hunton.com

Julie Ilene Ungerman
HUNTON & WILLIAMS, LLP
jungerman@hunton.com